STATE OF MINNESOTA vs. WILLIAM LENTZ.

45 177
68 435

January 5, 1891.

Trial for Murder—Defence of Suicide—Evidence of Absence of Motive.—Upon a trial for murder, it appearing that the deceased either committed suicide or was killed by the defendant, it was competent for the state to prove the condition in life and personal surroundings of the deceased, tending to show the absence of any motive which would be likely to impel to suicide.

Same—Evidence of Motive of Defendant.—It was also competent for the state, for the purpose of proving a motive on part of defendant to commit the crime, to show that he was a suitor of the sister of the deceased, and that the only opposition to his suit was from her brother, and that this opposition, together with the declared intention of the girl not to act in the matter against the wishes of her brother, was known to the defendant.

Same—Hearsay Evidence.—Statements of opinion by members of deceased's family, that he committed suicide, and that defendant was not guilty, were incompetent.

Same—Instruction that Defendant must be Convicted of Murder or Wholly Acquitted.—Where the evidence not only contained no suggestion of any provocation, or other mitigating circumstances, or that the killing was accidental, but affirmatively negatived any such hypothesis, it was not error for the court to instruct the jury that no degree of manslaughter, and no degree of murder, except murder in the first degree, was applicable to the case; that, if they were satisfied beyond a reasonable doubt that the defendant killed the deceased with a premeditated design to effect his death, they must find him guilty of murder in the first degree; but that, if they were not so satisfied beyond a reasonable doubt, they must acquit him.

New Trial—Affidavits of Jurors.—Affidavits of jurors, as to what their fellow-jurors did or said in the jury-room, are inadmissible to impeach their verdict.

Appeal by defendant from a judgment of the district court for Blue Earth county, after a trial before *Severance, J.,* and verdict of guilty of murder in the first degree, and a motion for a new trial denied.

*Pfau & Young* and *J. L. Washburn,* for appellant.

*Moses E. Clapp*, Attorney General, *D. Smith*, and *Lorin Cray*, for the State.

MITCHELL, J.    The defendant was indicted, tried, and convicted of the crime of murder in the first degree, committed by cutting the throat of one John G. Schwartz, with a razor.    The following statement of facts established by the uncontradicted evidence will be sufficient to explain and illustrate all the questions involved in this appeal:    William Schwartz was a farmer, living on his farm with his family, consisting of his wife, his son, the deceased, John G., a young man, aged about 21 years, his daughter Emma, aged about 18 years, three younger children, and his aged father-in-law.    The defendant, a young man, aged about 24 years, whose usual occupation seems to have been working out as a farm-hand, had come from Wisconsin to that neighborhood, and become acquainted with the Schwartz family, and thereafter, and for nearly a year previous to the alleged murder, had been making his home with them, but occasionally working for others in the neighborhood.    The deceased and defendant occupied together a small bed-room in the second story of the house, sleeping in the same bed.    On the night of the death of the deceased, (July 10th,) the two occupied the room together as usual, they being its sole occupants, the deceased lying in front, and the defendant on the back, of the bed, which was against the wall of the room, the foot of the bed being towards the door.    About 4 o'clock in the morning, the father of the deceased, who, with his wife, slept down-stairs, was awakened by a noise and commotion up-stairs, in the room occupied by the defendant and deceased, and, having arisen to ascertain the cause, and stepped out of his sleeping-room, met the deceased at the foot of the stairs, with his throat cut and bleeding profusely.    The deceased went on out into the yard, and died in a very few moments, without uttering a word, one jugular vein and the carotid artery being entirely severed, and the windpipe nearly severed, and consequently the power of speech gone.    Much blood was found in the room in which deceased and defendant slept, particularly on the pillow and upper part of the front side of the bed, where deceased slept, and on the floor near the door of the room.    A bloody razor was found on the floor of the room.    The razor was one that belonged

to deceased, but had been used in common by him and the defendant. The defendant, partially dressed, and with blood on different parts of his person and clothing, came down-stairs very soon after the deceased did, and made the statement to the family which he subsequently repeated at the coroner's inquest, and again on the trial of this case, at which he was a witness in his own behalf. This statement is that he slept at the back of the bed, and the deceased in front; that, when he woke up in the morning, the deceased was sitting on the front of the bed with his feet on the floor and his hands on his knees; that he (defendant) thought it was too early to get up, and turned over with his face to the wall, but could not go to sleep any more, so he got up, and slipped around the deceased, who was still sitting on the edge of the bed, and passed between him and the foot of the bed, and got out, picked up his pants, put them on, and buttoned them, standing near the foot of the bed with his back towards the deceased; that, just as he finished buttoning his pants with his left hand, and was reaching for the door with his right, he received a push on his shoulder which caused him to fall on the floor, and against the wall, and, when he got up, the deceased was out of the room, and he then followed down, right after him, to find out what was the matter. Defendant also stated that not a word was spoken by either of them that morning, and that he did not see the deceased, or hear him move, after he last saw him sitting on the edge of the bed, until he gave him the shove and ran out of the room. There is not, and under the evidence could not be, any question but that the deceased's throat was cut with the razor, and that either defendant committed the deed or that the deceased committed suicide; the former being the theory and claim of the state, and the latter the theory of the defendant, upon the trial.

1. For the purpose of proving the absence of any motive to induce the deceased to commit suicide, the state, against the objections of the defendant, was permitted to introduce evidence to show the good health of the deceased, his cheerful disposition, particularly on the preceding evening, also that he had been keeping company with a young woman of the neighborhood, to whom he was expecting to be married, and that it was the expressed intention of his father, known

to him, to give him an adjoining tract of land as a farm on which to start for himself. The admission of such evidence is assigned as error; but its competency and materiality are quite apparent. The case being shut up to the alternative of suicide or murder, evidence as to the conditions in life and personal surroundings of the deceased, which would tend to show an absence of any motive to commit suicide, was clearly competent on the part of the state, for precisely the same reason that, in so far as they might be likely to impel to suicide, such conditions and surroundings would be competent evidence on part of the defendant.

2. For the purpose of showing a motive on the part of the defendant to commit the crime, the state was permitted, also against defendant's objection, to introduce evidence tending to show that defendant was a suitor of the girl Emma; that his suit was acceptable to her and to her parents, but was opposed by the deceased, who preferred another suitor; that his opposition, as well as the declared intention of Emma "to mind" her brother in the matter, was communicated and known to the defendant, who evinced somewhat strong feelings at the chance of not getting the girl. This evidence was properly admitted. It is always competent, as well as of the greatest importance, to show a motive on part of the defendant to commit the crime of which he is accused. If there be a motive which can be assigned, the adequacy or inadequacy of it, according to our standard, is a matter of no controlling importance. What would be a motive to one mind might not be to another. Whether a motive is adequate to induce the commission of crime depends on the peculiar circumstances of each case, and the particular character of the defendant. The history of crime shows that murders are often committed from motives comparatively trivial and slight, and among the most common of these are such as to obtain, by inheritance or otherwise, a small amount of property, or to remove some person who is an obstacle to a desired marriage. The evidence was competent. Its weight was a question for the jury.

3. Other assignments of error have reference to the exclusion of certain evidence offered by defendant. These are so manifestly without merit that if this was not a capital case, we would not deem it

our duty to notice them. For example, the defence offered to prove that, on the morning of deceased's death, and shortly afterwards, members of his family expressed the opinion that he committed suicide, and that defendant did not commit the deed. This was clearly incompetent. It was in effect an attempt to prove what the witnesses thought as to the guilt or innocence of the defendant. It was also sought to prove that, according to the rules of the Lutheran Church, to which this family belonged, a suicide cannot be buried in the church burying-ground. The alleged purpose of this was to show that it furnished a motive to them to accuse the defendant of the crime, or at least to color their evidence against him, so as to secure a Christian burial for the deceased. The inference sought to be drawn from the fact proposed to be proved was entirely too remote and doubtful to render the evidence admissible for any such purpose. The evidence that the younger sister Lena was subject to fits and fainting-spells was clearly irrelevant, as it had not the slightest tendency to prove a suicidal disposition on part of her brother.

It is also claimed that during the trial the court erred in permitting counsel for the state repeatedly to make, in the hearing of the jury, unwarranted and unsupported statements of what they expected to prove, which had a tendency to prejudice the jury against the defendant. We find nothing in the record to support this charge. It is often necessary, when evidence is objected to, for the counsel offering it to state the purpose for which it is offered, and what evidence they propose to follow it with, in order that the court may rule intelligently upon its admissibility, and we fail to find any instance in which counsel abused this right.

It is also contended that the court erred in admitting in evidence the shirt worn by defendant at the time of the alleged murder, because it had been subsequently washed, and hence was not in the same condition as when worn by the defendant. This garment had, without objection, been previously exhibited to the jury and used by witnesses to show where the blood was on it when worn by defendant on the morning of the alleged murder, and we fail to see how he could be prejudiced by the formal introduction of it in evidence.

Moreover, it does not appear that at the time of the trial there was anything in its appearance at all prejudicial to the defendant.

4. Objections are made to a certain portion of the charge of the court. These might be properly disposed of by saying that no exceptions were taken to any part of the charge; but the portion complained of was, under the state of the evidence, entirely correct. It was, in substance, that no degree of manslaughter, and no degree of murder but in the first degree, was applicable to the case; that if they believed from the evidence, beyond a reasonable doubt, that the defendant killed the deceased by cutting his throat with a razor, and that he perpetrated the act with a premeditated design to effect his death, then they should find defendant guilty of murder in the first degree, but if they do not so believe, beyond a reasonable doubt, then they should acquit him. When it is considered that murder in the first degree may be proved by the mere fact of an intentional killing, and that in this case the evidence contained no suggestion of any provocation or other mitigating circumstances, or that the killing was accidental, the testimony of the defendant himself excluding any such hypotheses, the killing, if committed by defendant, was murder in the first degree, and there was no evidence that would have justified the jury in finding defendant guilty of any less degree, if they found him guilty at all. On the evidence, the instruction was clearly correct. *State* v. *Lautenschlager*, 22 Minn. 514; *State* v. *Hanley*, 34 Minn. 430, (26 N. W. Rep. 397;) *State* v. *Brown*, 41 Minn. 319, (43 N. W. Rep. 69.)

5. It is further contended that the verdict was not justified by the evidence. The testimony is exceedingly voluminous, nearly 1,000 folios, and the circumstances tending to prove defendant's guilt are very numerous. Hence no summary of the evidence that could be made here would do the case justice; but we have very carefully read over the entire record, and are fully impressed with the opinion that, so far from not justifying the verdict, it makes a very strong case against the defendant. Without attempting any analysis or extended discussion of the evidence, we content ourselves with saying that it is clear that it was either a case of suicide or of wilful and deliberate

murder; that a motive on part of defendant to commit the crime was proved; that, to say nothing of the presumption arising from the natural instinct of the love of life, the existence of any conceivable cause to impel the deceased to suicide was affirmatively disproved; that no circumstance was proved inconsistent with defendant's guilt, but, on the contrary, most of the facts proved tended more or less strongly to fasten the crime upon him. All the physical facts, such as the location of the blood on the bed, the character and direction of the cut in the throat of the deceased, point strongly to the conclusion that it was inflicted not by his own hand, but by that of a person standing in front of the bed, and while deceased was lying on his back on the front of the bed with his head on the pillow.

6. Another ground urged why a new trial should be granted is the alleged misconduct of certain of the jurors. So far as this charge was made by the affidavits of others than the jurors themselves, it is all denied by the affidavits of the jurors against whom the charge was made, except the fact that one of them said, on one occasion, to defendant's counsel, that "there was one point in the case which he would like to have cleared up," to which counsel replied that he had better see the judge, and then left him. This was an imprudent act on part of the juror, but it is impossible that defendant could have been prejudiced by it. As to all other matters, the opposing affidavits left the proof *in equilibrio.* It was the province of the trial judge to weigh the affidavits and their credibility. The affidavits of the jurors were clearly inadmissible to impeach their own verdict by showing what occurred in the jury-room, to wit, that certain jurors had copies of a newspaper purporting to contain the evidence given on the trial, to which they referred in their discussions of the case; also that a certain juror told his fellows that the judge had told him that, if they found a verdict of guilty, accompanied by a recommendation to mercy, the death penalty could not be inflicted, and that, relying on such statement, they assented to a verdict of guilty, which otherwise they would not have done. That such affidavits by jurors to impeach their own verdict are not admissible is too well settled by the decisions of this court to admit of discussion now. Whatever

exceptions may possibly exist to the general rule, certainly the affidavits offered in this case do not come within any of them. *St. Martin* v. *Desnoyer*, 1 Minn. 131, (156;) *Knowlton* v. *McMahon*, 13 Minn. 358, (386;) *State* v. *Stokely*, 16 Minn. 249, (282;) *State* v. *Beebe*, 17 Minn. 218, (241;) *State* v. *Mims*, 26 Minn. 183, (2 N. W. Rep. 492, 494, 683; *Bradt* v. *Rommel*, 26 Minn. 505, (5 N. W. Rep. 680;) *Stevens* v. *Montgomery*, 27 Minn. 108, (6 N.W. Rep. 456.) The rule laid down by some few courts, that affidavits of jurors are admissible to prove any matter occurring in the jury-room which does not essentially inhere in the verdict itself, and hence not resting in the personal consciousness of the jurors, but matters of sight and hearing, and therefore accessible to the testimony of others, and subject to contradiction, has never received the sanction of this court, as will be apparent from the examination of the records in several of the cases already cited.

As the 11th and 22d assignments of error were not urged either in the brief or on the oral argument, we do not feel called on to consider them further than to say that they are without merit.

As we find no error in the record, the order and judgment appealed from are affirmed, and the cause remanded, with directions to proceed to carry it into execution.