19 So.2d 11

**BLUE v. STATE.**

**6 Div. 211.**

Supreme Court of Alabama.

June 29, 1944.

Rehearing Denied July 25, 1944.

Ross, Ross & Ross, of Bessemer, Beddow, Ray & Jones, of Birmingham, and G. P. Benton, of Fairfield, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and John O. Harris and Geo. C. Hawkins, Asst. Attys. Gen., for the State.

STAKELY, Justice.

Appellant was tried under an indictment charging murder in the first degree. He was convicted of murder in the second degree and his punishment fixed at imprisonment in the penitentiary for a term of fifty years. This appeal is from the judgment of conviction and the sentence rendered thereon.

In the course of the trial, the court was called upon to make numerous rulings. It is claimed by appellant that there is error in many of these rulings. Based on these rulings, the contentions of appellant may be summarized as follows: (1) The method of drawing and impaneling the jury is illegal, since the statutes providing for the procedure which was followed are unconstitutional and void. (2) The defendant was entitled to the general affirmative charge. (3) The defendant did not receive a fair and impartial trial, since the trial was had in an atmosphere of prejudice and bias. (4) The court was in error in various rulings on the evidence.

The record shows that in drawing and impaneling the jury, the procedure which was followed is the procedure provided exclusively for Jefferson County by §§ 196 et seq., Title 62, Code of 1940. It is claimed that these statutes are unconstitutional and void, as being violative of §§ 106 and 110 of the State Constitution and as infringing the 14th Amendment of the Constitution of the United States. It is further claimed that the procedure which should have been followed is provided in §§ 30 et seq., Title 30, Code of 1940. The constitutional questions were aptly presented, as for example by motion to quash the venire, which was overruled by the trial court. All of these constitutional questions were recently considered by this court in the case of Burns v. State, 19 So.2d 450.[1] On the authority of that decision, the court was not in error in upholding the method of drawing and impaneling the jury. Fur-

[1] Post, p. 135

ther discussion of this feature of the present case is unnecessary.

■ It is insisted by the appellant that there was not sufficient evidence in the case to support a conviction. If this is true, then the court was in error in refusing to give the general affirmative charge and in overruling the motion for a new trial so far as it was predicated on the weight of the evidence and on the court's action with reference to this charge. In passing on the question here presented, it is well to bear in mind some fundamental principles. A mere scintilla of evidence is not sufficient to justify a submission to the jury. On the contrary, "there must be substantial evidence tending to prove all the elements of the charge."

"After an examination of the authorities, we have been unable to find any decision of this or any other court of last resort that has invoked the 'scintilla rule' to uphold a criminal prosecution.

    \*    \*    \*    \*    \*

"These utterances are clearly inconsistent with the thought that a mere 'gleam,' 'glimmer,' 'spark,' 'the least particle,' 'the smallest trace,'—'a scintilla'—is sufficient, in the face of the presumption of innocence, to require the court to submit the issues in a criminal case to the jury, and the scintilla rule, in this sense, does not apply to criminal prosecutions. There must be substantial evidence tending to prove all the elements of the charge." Ex parte Grimmett, 228 Ala. 1, 2, 152 So. 263, 264.

See also Inge v. State, 28 Ala.App. 38, 178 So. 453; Id., 255 Ala. 280, 178 So. 454; Willis v. State, 29 Ala.App. 365, 369, 197 So. 62; Id., 240 Ala. 52, 197 So. 67.

■ But it is equally true that where there is evidence of a substantial nature tending to establish the material issues of the case, then the affirmative charge should be refused. Hargrove v. State, 147 Ala. 97, 41 So. 972, 119 Am.St.Rep. 60, 10 Ann. Cas. 1126. It therefore becomes necessary to examine the evidence to see if it meets the requirements of the principles stated above.

Tendencies of the evidence showed the following: The defendant, Dr. James Howard Blue, and his wife, Laura Blue, deceased, lived at Bessemer in their home on the northeast corner of Dartmouth Avenue and 21st Street. The house faced West and ran back East along 21st Street. The living room was across the front of

the house and running back East from the living room on the right side of the house was a hall, entered by a door from the living room. Back of the living room on the left side of the house were the dining room, breakfast room and kitchen. Proceeding East toward the back of the house along the hall there was a door entering to the right which gave access to the bedroom of defendant, and adjoining it was the bedroom of his wife, which was entered by a door from the hall just beyond the door opening into defendant's room. Along the wall to the right just before the entrance to defendant's bedroom was a bookcase 4½ feet high, 34 inches long and 12 inches deep, and the distance from the nearest end of the bookcase to the living room was 8½ feet. The hall is about 45 or 46 inches wide. The shotgun, which will be hereinafter referred to, is 46 inches long and requires the trigger to be pulled each time the gun is fired.

On the night of May 23, 1943, a neighbor who lived on the corner directly across 21st Street, while lying in bed reading, the windows being opened, around 10:00 P. M. heard three shots ring out in rapid succession, with uniform spacing of time between the shots. The shots came from the Blue home, where the lights were on. This witness saw no one come out of the house.

We go now to the testimony of the defendant himself. The defendant testified in substance as follows: At about 9:45 P. M. he retired to his own bedroom, turned out its lights, but leaving on the lights in the living room, kitchen and dining room. While asleep he was awakened when his wife entered his bedroom and turned on the light by a switch which was located on the wall near the door. His wife approached a little table about two feet to the right of the bed upon which defendant was lying. There was a 16-gauge gun located immediately behind the table. As she approached the bed, table and shotgun, she said: "I am going to kill you and kill myself and end it all," and she reached and got the gun. Immediately defendant got out of bed. Mrs. Blue backed out of the bedroom into the hall and upon entering the hall, she turned to her right and went toward the living room. She shot up the hall toward the living room. The content of the shell went through a pane of glass located in a window in the living room immediately next to the street. The defendant came out the door of his

bedroom into the hall, following the deceased,·the space intervening between them being about 3, 4 or 5 feet. Immediately after the gun was discharged the first time, the deceased turned and fired again, the content of that shell entering the top of the bookcase, which was introduced in evidence. When the second shot was fired, defendant was in a crouched position. He grabbed the barrel of the gun and pushed it up, forcing the stock down and pushing the barrel away from him. He testified: "I don't know just what the maneuvers of the gun were." According to his best judgment, he took hold of the barrel of the gun with his left hand. During the struggle there was a third explosion of the gun and the content of that shell entered the left side of the head of the deceased immediately in front of the left ear. A portion of the content of the last shell struck the ceiling immediately over the point where the defendant and the deceased were struggling over the shotgun. After the shooting, defendant placed the gun in the closet in his bedroom. Only defendant and his wife were in the house at the time.

Now turning from the testimony of the defendant, tendencies of the evidence further show that the defendant called the Brown Service Funeral Home around 10:-00 P. M. and George Garner, an employee, answered the 'phone. The witness Garner swore that the defendant asked for Tom McCollum, who is the resident manager of the funeral home, and who was special investigator to the County Commission, performing the duties of coroner, and who has also been for more than twenty years a close personal friend of the defendant. The witness replied that McCollum was not there and asked if he could be of help. Defendant said he did not know, that he thought he needed two or three ambulances and needed them at the mines, and asked Garner if he knew him. Garner told defendant that he did and asked if he should send the ambulances. Defendant asked him for McCollum's residence telephone number, which he gave the defendant. Defendant did not in this conversation indicate in any way that his wife had been shot and was dead.

About 10:20 defendant called the witness McCollum over the telephone and on being asked by McCollum what was the trouble, replied "that it had happened," and when asked by the witness what had happened, the defendant said, "Come on up and see," whereupon the witness immediately went to the Blue home. On reaching the Blue home, he asked the defendant what had happened and the defendant told the witness "to see for himself." The witness again asked him what had happened and the defendant again told him "he could see for himself if he would walk down the hall."

Going into the hall, the deceased, wife of the defendant, was found lying on her back in the hall along the bookcase, with her head toward Dartmouth Avenue and her head being about four or five inches beyond the end of the bookcase which was nearest to the living room. She was fully clad, with her right hand across her body, her left hand lying on the floor along the left side of the body. Her brown leather pocketbook was on the floor lying across her left side between her left arm and left side, and under the fingertips of her right hand and on her body just below the point where her right hand was, was a set of keys in a leather case. The deceased was shot on the left side of the head above the ear, ranging back.

The defendant was in pajamas and house slippers at the time witness arrived at his residence. Witness McCollum further swore that defendant appeared to be drunk and had talked like a drunken man over the telephone. The radio was playing in Dr. Blue's bedroom. Witness asked the defendant "if he shot her," to which defendant replied "that he didn't know." Witness asked the defendant to hand him the gun that was used in the shooting. Defendant said he didn't know whether it was the .22 rifle or the 16-gauge Browning Automatic, both of them being in the closet in defendant's bedroom. Witness found three exploded shotgun shells in the hall pretty close to the bedroom door of the defendant and the shotgun had been freshly fired. The shells were two Nitro Long Range Express shells and a Peters No. 16 shell.

After placing the defendant in jail, the coroner called Arthur Green, deputy solicitor; R. B. Ragsdale, special investigator in the solicitor's office; and Clyde W. Morris, chief deputy sheriff, and reported the killing. All of them then went to the Blue home and made an investigation, nothing being changed in the meantime, the house having been locked up by McCollum. Tendencies of the evidence showed that there

were no brains, pieces of skull, blood or hair, or wadding from shotgun shells from the point where the body was lying toward the defendant's bedroom door. The shotgun waddings, fourteen in number, were all found in the entrance from the hall to the living room, in the alcove in the hall and in the living room. The alcove is an inset in the hall next to the living room. The largest piece of skull and hair was found on the table in the living room, the table being right below the window through which one of the shells had gone. There was one fresh bullet hole through the window 4½ feet from the bottom, and an old bullet hole six inches below the fresh bullet hole. The window in the living room was in line with the hallway.

Tendencies of the testimony showed that a Blue Whistler went through the front room window, the screen wiring protruding and being spread out on the outside of the screen. There was freshly broken glass from the windowpane on the outside of the house. There were fresh shots that had entered the plastering in the hall over the living room door and No. 1 buckshot, many in number, were found in this plastering and on the floor at the living room door. These No. 1 shots covered an oval-shaped area about 12 inches from top to bottom and about 18 inches 'from side to side. There was blood and hair and brains on this space.

There was a hole in the ceiling of the hall that went through the plastering and into the lath underneath the plastering, but did not penetrate or go through the laths. The hole did not go through the ceiling. This hole was about three inches wide and six inches long, the length of the hole being in the same direction as the length of the hall.

The investigating officers, and in addition Mrs. Sarah Davis, who cleaned the house early the following morning, testified that there was no blood or any human debris of any kind whatever in the hole in the ceiling, but there were on the ceiling. This hole was about halfway between the point where Mrs. Blue's head was and the living room door. The assistant State Toxicologist, C. D. Brooks, testified that the shot that entered the ceiling was made by No. 1 buckshot and not by a Blue Whistler, and that the buckshot had ricocheted and entered into the plastering over the living room door. Brooks also testified that there

was a hole going from the hallway into the living room on the left side of the door going into the living room and there was an indentation or depression in the plastering about eight inches or so to the left of the doorframe and about six feet from the floor. McCollum swore that he found a pellet on the floor near the telephone stand, which was located in the inset from the hall. The pellet was introduced in evidence. According to the witness Brooks it had plastering and blood on it and it had the appearance of having human flesh on it. Tendencies of the evidence showed that there was hair and brains on the wall of the hall opposite the bookcase. Tendencies of the evidence showed that the deceased weighed about 100 or 105 pounds, was frail and delicate, and in height about five feet one and one-half inches to five feet two and one-half inches; that powder burns were on her right hand from forefinger to thumb continuously, and in the language of the witness McCollum, "Just a circle in the— it reached about a quarter of the palm of the right hand, back to the bottom." There were no powder burns on her left hand. There was testimony that the deceased left a hotel in Bessemer about ten minutes to ten, the night of her death. She had gone to the hotel to carry her father his supper. He lived at the hotel and was aged and infirm. Her appearance at the hotel was normal.

Tendencies of the testimony further showed that the hole in the top of the bookcase was first discovered the morning after the shooting by the witness Mrs. Sarah Davis, who discovered the hole when she went to move the bookcase in order to clean up the hall; that she noticed the hole for the first time when she put her hand on the runner covering the hole and that she did not see the hole until she removed the runner from the top of the bookcase. Tendencies of the testimony showed that magazines and books on the top of the bookcase, as well as the wall against which it was standing, were not injured in any way. The runner was introduced in evidence showing a hole, but testimony tended to show that when the runner was first examined there was no such hole in the runner. Mrs. Davis swore that when she first saw the runner it "looked like a thread pulled in the bottom where it is torn now." The investigating officers and Mrs. Davis testified that they found no fragments of wood near the bookcase or in the hallway.

Tendencies of the evidence further showed that the deceased was addicted to the use of opiates, usually pantopon, but also morphine, cocaine, codeine sulphate, amytal, and barbaturic drugs. The defendant himself testified that he had shot the gun in the house on occasions to quiet the nerves of his wife. The witness Barnard, who was the warden in the jail, testified that when the defendant was brought to jail, the defendant did not appear to be under the influence of liquor and he smelled no liquor on the defendant.

To sum up the situation, it is contended by the State that all of the three shots were fired from the defendant's bedroom door toward the front of the house; one shot, a Blue Whistler, went down the hall through the front window of the house in the living room, and another shot, a No. 1 buckshot, hit the ceiling in the hallway and ricocheted into the plastering over the door of the living room, and another shot, a Blue Whistler, struck the plastering on the left of the living room door.

The contention of the defendant is that the first shot went down the hall and through the living room window at the front of the house, the second shot entered the top of the bookcase, and the third shot entered the head of the deceased and ranged upward and struck the ceiling.

There is evidence in the record tending to show threats made by the deceased against her husband, the defendant; that she was accustomed to the use of firearms; that she had suicidal inclinations and was abnormal from the use of drugs. And on the contrary there is evidence tending to rebut the foregoing evidence and showing her to be kind, gentle, normal, desirous of living, and a lady at all times.

■■ We think it unnecessary to debate the evidence. In dealing with the sufficiency of the evidence no conviction should be had upon guesswork and suspicion, but must be based upon substantial evidence as to every material element of the crime of such a character as to convince a fair and impartial jury of the guilt of the accused. In the case at bar we think there is evidence disclosed by the record which meets the test and which, if believed, made the case a case for the jury. Accordingly, we find that there was no reversible error in refusing to give the affirmative charge or in overruling the motion for a new trial predicated on the weight of the evidence. Russo v. State, 236 Ala. 155, 181 So. 502.

■ The appellant contends that there were various incidents in the trial of the cause which created such an ineradicable prejudice and bias against him as to deprive him of a fair and impartial trial. We cite them as follows: Argument by the Assistant Solicitor to the jury as follows: "When this thing happened out here, gentlemen of the jury, it blew the lid off in this community and the populace wanted him prosecuted if he killed her." Statement made by the solicitor in his argument to the jury about Jimmy, the son of defendant, who was a witness for the defendant: "They have had much to say about his sixteen-year-old son, Jimmy, and I want to say to Jimmy, 'Shame on you son, coming here and testifying as you have done.' Is Dr. Blue's soul so dead that he could bring his child here at a time like this?" The following reference by the solicitor to the young son of the defendant, "May God forgive you, son." The following questions propounded Jimmy, the young son of defendant: "Jimmy, have you got a picture of your dead mother in your possession?" and the further question, "Is your mother in heaven now?" And the further question, "How do you feel about it, is your mother in Heaven now?" The following remark made by the solicitor: "I am representing the State, not like Mr. Beddow, a paid lawyer." The following statement made by the solicitor: "Mr. Beddow takes the position that criminal lawyers have got the right to ask any question that they want to," and the further statement: "Whenever they attempt to shut the solicitor off they are doing it by virtue of their right to clear the defendant whether he is guilty or innocent of the crime charged and it is not right." Statement by the assistant solicitor in his argument to the jury: "Dr. Blue is damned when he employs George Ross and Roderick Beddow to come out here and blacken the character of his wife's name; getting them to base their defense on the weakness of his wife as being a drug addict."

In determining the question before the court, we do not think that each of the above statements must be analyzed separately to see whether or not, if standing alone, it would create an ineradicable bias or prejudice. We think, on the contrary, that these various statements should be considered together to determine whether or not, in their cumulative effect, they created a prejudicial atmosphere. It may be that some of the statements of the solicitor

were replies in kind to statements made by counsel for the defendant, and we fully recognize, as said in Arant v. State, 232 Ala. 275, 167 So. 540, 544, "a trial is a legal battle, a combat in a sense, and not a parlor social affair." The record shows that the presiding judge exercised great patience and in most of these incidents did what he could to disabuse as far as possible the minds of the jury of any prejudicial impression; but it is our duty to see to it that trials are free from prejudice and passion and that the courthouse means that where a conviction is obtained, it is obtained in an impartial atmosphere. The foregoing remarks were made in the presence of the jury. Considering them in their cumulative effect, we think that they were calculated to inject the poison of bias and prejudice into the minds of the jury. They created an atmosphere of bias and prejudice which no remarks by the court could eradicate. This is not justice and prejudicial error has been shown. Kabase v. State, 244 Ala. 182, 12 So.2d 766.

"Reverting to the various arguments and statements which the appellant assigns as showing a general course of prejudicial appeal to the jury, and as creating a general atmosphere of illegal presentation of facts, etc., it is not necessary to consider whether any one or more of these occurrences, if standing alone, would require a reversal. We content ourselves with stating that, as to several of these a serious question would be presented on the single occurrence, even if it were not accompanied by many other such occurrences throughout the trial. While, in most of the instances, the court sustained the defendant's objections and granted his motions to exclude, these occurrences were so numerous, and in many instances evidenced such persistence of effort to present to the jury facts held illegal by the court, that they could not have failed to prejudice the defendant." Pointer v. State, 24 Ala.App. 23, 129 So. 787, 789, 790.

While not found applicable, the foregoing principle was not denied by this court in Vaughn v. State, 236 Ala. 442, 183 So. 428, 431. See also Moore v. State, 30 Ala. App. 552, 9 So.2d 146.

The following cases are worth noting, even though the court in these cases made no effort to disabuse the minds of the jurors:

In DuBose v. State, 148 Ala. 560, 42 So. 862, it was said:

"The solicitor in his closing argument to the jury stated, 'That the good citizens of the municipality had met on the next day after the killing, trying to find out the guilty culprit, and that the defendant was not there.' The defendant objected to this statement of the solicitor, and moved to exclude it, which motion the court overruled and defendant excepted. There was no evidence of such a meeting of citizens as is referred to in this statement, and that the defendant was not present at such meeting.

"Counsel, as has been repeatedly held, should never be allowed, in argument to the jury, to state or comment on facts damaging to defendant, of which there is no evidence before them, and of which no legal evidence could be admitted." DuBose v. State, 148 Ala. 560, 42 So. 862, 863.

In the case of Mitchell v. State, 28 Ala. App. 119, 180 So. 119, this court said:

"The remaining question presented refers also to alleged improper argument of the solicitor wherein he turned to the defendant and stated: 'You been slick too long, and your money made a fool out of you. You thought you could take your money and beat the case.' In the first place there was no evidence in the case upon which to predicate the remarks complained of, and, being outside the record, the court should have sustained defendant's objection and granted his motion to exclude. Furthermore, we know of no provision of law, or rule of practice, providing that an attorney or solicitor may address his remarks direct to the defendant personally instead of confining his argument to addressing the jury. It cannot be doubted that the incident here complained of was prejudicial to the substantial rights of the accused and tended to place him in undue opprobrium before the jury." Mitchell v. State, 28 Ala.App. 119, 180 So. 119, 122, certiorari denied 235 Ala. 530, 180 So. 123.

The Court of Appeals, in dealing with the ruling of the lower court on a motion for a new trial, where ineradicable bias was shown in Emerson v. State, 30 Ala. App. 248, 4 So.2d 183, said:

"The trial judge, by its rulings, undertook to avert some of these prejudicial and erroneous matters, but, in our opinion, it was impossible to do so, the jury having heard and seen all that had occurred in this connection. What this court said in our case of Cassemus v. State, 16 Ala.App.

61, 75 So. 267, 268, is peculiarly applicable here. Viz:

"'A defendant is entitled to a fair trial by jury according to the law and the evidence, and such trial should be free from any appeal to prejudice or other improper motive. It would appear that the learned and upright judge before whom this trial was conducted did all in his power to right the wrong occasioned by the improper and untimely remarks of the solicitor; it cannot, however, be seriously doubted but that the poison that had been injected would be difficult to eradicate; * * * and therefore the court was in error in overruling defendant's motion for a new trial.'" Emerson v. State, 30 Ala.App. 248, 4 So.2d 183, 185.

In view of the conclusion which we have reached, the motion for a new trial should have been granted. § 764, Title 7, Code of 1940.

Upon further consideration and as a guide to further proceedings in the lower court, we proceed to a discussion of other questions raised in the trial of the case.

### Threats.

Alleged threats of the defendant to his wife, though made several years prior to the time of the alleged killing, were competent, as tending to show malice on the part of the defendant toward his wife. Commonwealth v. Holmes, 157 Mass. 233, 32 N.E. 6, 34 Am.St.Rep. 270; Shelton v. State, 217 Ala. 465, 117 So. 8; Rector v. State, 11 Ala.App. 333, 66 So. 857; Walker v. State, 85 Ala. 7, 4 So. 686, 7 Am.St.Rep. 17; Pulliam v. State, 88 Ala. 1, 6 So. 839; 30 C.J. 189.

The State introduced the evidence of Alf Ball, deceased father of deceased wife of the defendant, which he had given in his lifetime, on the preliminary hearing. This testimony showed a threat made against both father and his daughter by the defendant. On this trial, the court admitted the evidence, but limited the threat only as against deceased wife of the defendant. This was not error. Shikles v. State, Ala.App., 18 So.2d 412,[1] certiorari denied, Ala.Sup., 18 So.2d 417;[2] Montgomery v. State, 160 Ala. 7, 24, 49 So. 902; 30 C.J. 191.

### Prior Quarrels.

There was testimony tending to show quarreling between the defendant and deceased during the spring of the year of the shooting, accompanied by cursing by the defendant and by the sound of shooting. The evidence was competent as tending to show malice. Smith v. State, 197 Ala. 193, 72 So. 316; Webb v. State, 26 Ala.App. 241, 157 So. 262; 26 Am.Jur. p. 371.

### Photographs of Place of Homicide.

Pictures of the scene of the homicide were admissible. Swindle v. State, 27 Ala.App. 549, 176 So. 372, certiorari denied 234 Ala. 621, 176 So. 375; Wilson v. State, 31 Ala.App. 21, 11 So.2d 563, certiorari denied 243 Ala. 671, 11 So.2d 568.

### Addiction to Drugs and Intoxicants.

There was evidence tending to show that the deceased had been for many years addicted to the use of drugs and intoxicants when she could not obtain drugs, and as a result of the use thereof, became abnormal. There was evidence tending to show that she was in such condition around six o'clock on the evening of the shooting. There was expert evidence tending to show that such a condition sometimes resulted in suicide, sometimes in a feeling of physical power far beyond that actually possessed, and sometimes in general degeneracy. There was evidence tending to show suicidal inclinations on the part of the deceased, including an effort on her part to make a suicidal pact with her husband. There was evidence tending to show threats on the part of the deceased toward the defendant and also evidence tending to show that at the time of the shooting deceased, a frail woman, made advances toward the defendant with the gun and stated in effect that she intended to kill both defendant and herself.

The defendant sought to show in a number of isolated instances the conduct and actions of the deceased while under the influence of drugs or intoxicants. In some of these instances the court allowed the witness to testify that the deceased was abnormal, but refused to allow the witness to show the details of the episode. In one of these instances, the court refused to allow the defendant to testify to the abnormality of the deceased when he was taking her on a train in January, 1942, to a sanitarium in North Carolina for treatment. In this instance, the court excluded proof not only of details, but also

[1] 31 Ala.App. 423.

[2] 245 Ala. 641.

proof of the general condition. The theory of the court in refusing evidence as to details in the isolated instances was that intemperate habits in the use of drugs and intoxicants is a collective fact and to allow proof of details would unnecessarily multiply the issues in the case, and further, as to the foregoing instance, that the incident was too remote in time to throw light on the issues of the case. It was error to refuse to allow the defendant to testify to the collective fact as indicated above. As we shall see, the difference in time between the particular instance and the time of the shooting, does not necessarily render the testimony inadmissible.

We further think that a serious question is presented in this particular case as to the ruling of the court in denying proof of the details of these isolated instances. In the case of Southern Natural Gas Co. v. Davidson, 225 Ala. 171, 142 So. 63, this court, in dealing with methods of proof of intoxication, said:

"Plaintiff's theory was that Ed Green was under the influence of intoxicating liquor at the time—admittedly material evidence. A witness may testify that the conduct and appearance of another was that he was intoxicated (May v. State, 167 Ala. 36(8), 52 So. 602; Stoudemire v. Davis, 208 Ala. 495, 94 So. 498; Burke v. Tidwell, 211 Ala. 673, 101 So. 599), but we do not think it is meant that such is the only method of proving intoxication. What is logically relevant for that purpose is legally relevant, and admissible unless some other rule is violated. A collection of circumstances held relevant is set out in the note to 19 Corpus Juris, 802.

"We think that the assignments of error 1, 2, 3 and 6 relate to evidence of circumstances which taken together are relevant to show intoxication of Ed Green. Though no one of them by itself may be proof of it, each is a circumstance of more or less value in connection with the others. From them all and other circumstances in the case the jury could infer that he was intoxicated." Southern Natural Gas Co. v. Davidson, 225 Ala. 171, 173, 142 So. 63.

Since proof by detail or circumstances can be a proper method of proof, was the appellant, under the peculiar circumstances in this case, injured by being deprived of this method of proof? It is the contention of appellant that his wife, a chronic and habitual user of drugs and intoxicants, with suicidal inclinations, while under the influence of opiates, sought to kill both appellant and herself, or having threatened the defendant, certainly sought to kill him. We think that her acts and conduct on other occasions, when under the influence of drugs and intoxicants, would tend to shed light on her acts and conduct on the night of the shooting. If on these other occasions she was unruly and violent and hard to manage and control, or showed suicidal characteristics, then we think that such characteristics resulting from or manifesting at other times her abnormality, would tend to shed light on the issues in this case. We are dealing not only with proof of intemperate habits, but also with the result or manifestation of intemperate habits. We are dealing with a case where there is proof tending to show abnormality. We think that our cases dealing with insanity provide a rule which is somewhat analogous to the problem with which we are dealing in so far as it is here pertinent.

"It is true that in the case of Howard v. State, 172 Ala. 402, 55 So. 255, 257, 34 L.R.A.,N.S., 990, this court held: 'In inquiries as to sanity or insanity, it has been held that "every act of the party's life is relevant to the issue." 1 Greenl. on Ev. (16th Ed.) p. 58. So statements of the defendant, made after the homicide, are competent to show the condition of his mind. Braham v. State, 143 Ala. 28, 39, 38 So. 919. And, in general, his acts, declarations, and conduct. McCurry v. Hooper, 12 Ala. 823, 46 Am.Dec. 280.'

"The broad expression quoted above, however, has been modified, and we think properly so, in recent decisions of this court. In Mitchell v. Parker, 224 Ala. 149, 138 So. 832, 834, in treating the rule announced in the Howard case, this court said: 'When the insanity, vel non, of a person is involved in the issue submitted to the jury, a wide latitude is allowed in tracing the life record of the subject. In fact, it has been said that, on such an inquiry, "Every act of the party's life is relevant to the issue." Howard v. State, 172 Ala. 402, 55 So. 255, 257, 34 L.R.A., N.S., 990. *Of course, this expression must be understood to carry the necessary limitation that the acts inquired about must throw some light upon the inquiry.*' (Emphasis supplied)

"In the case of George v. State, 240 Ala. 632, 200 So. 602, 606, it was said: 'Evidence to show insanity is not confined to evidence of the mental condition of the ac-

·cused at the instant of the act, though whatever facts are adduced must tend to show the mental state at that moment.'" Coffey v. State, 244 Ala. 514, 14 So.2d 122, 127.

The lower court was in error in this regard.

### Rebuttal Evidence.

 The defendant had introduced in evidence acts and declarations of the deceased over a considerable period of time tending to show her weariness of life and a readiness to end it. By proof of these acts and declarations evincing an unhappy state of mind, the defendant opened the door to the State to show acts and declarations tending to evince a different state of mind, that is, a state of mind consistent with the desire to live. These acts and declarations of deceased were admissible, not as evidence of the truth of what was said and done, but as tending to show a state of mind inconsistent with the presence of suicidal intent. In the case of Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 25, 78 L.Ed. 196, Mr. Justice Cardozo, speaking for the Court, said:

"The defendant had tried to show, by Mrs. Shepard's declarations to her friends that she had exhibited a weariness of life and a readiness to end it, the testimony giving plausibility to the hypothesis of suicide. Wigmore, § 1726; Commonwealth v. Trefethen, 157 Mass. 180, 31 N.E. 961, 24 L.R.A. 235. By the proof of these declarations evincing an unhappy state of mind, the defendant opened the door to the offer by the government of declarations evincing a different state of mind, declarations consistent with the persistence of a will to live."

See also Commonwealth v. Trefethen, 157 Mass. 180, 31 N.E. 961, 24 L.R.A. 235; Nordan v. State, 143 Ala. 13, 39 So. 406.

 Where there are circumstances which suggest that a person, charged to have been murdered, committed suicide, it is competent for the prosecution, for the purpose of repelling the theory of suicide, to show that the deceased was in good spirits and happy and in this connection the prosecution could show the friendly conduct and conversation of the deceased. Porter v. State, 86 Tex.Cr.R. 23, 215 S.W. 201; State v. Baldwin, 36 Kan. 1, 12 P. 318; People v. Selby, 198 Cal. 426, 245 P. 426; State v. Lentz, 45 Minn. 177, 47 N.W.

720; 40 C.J.S., Homicide, § 217, p. 1130; Wigmore, 3rd Ed., Vol. I, § 144, p. 581.

There was no error in this regard.

We find no merit in other points argued by the appellant, but for the errors indicated above, the judgment of the lower court is reversed and the cause is remanded.

Reversed and remanded.

All the Justices concur.

### On Rehearing.

Opinion modified and extended; application for rehearing overruled.

All the Justices concur.