CATES, Presiding Judge.
This appeal is from a conviction of rape. The verdict below set punishment at ten years imprisonment.
I
The prosecutrix testified that at the time of the charged offense she was fifteen years old. On a June night in 1971, a girl friend had asked the prosecutrix to double date with two young men ostensibly to go bowling until four in the morning. The prosecutrix’s mother consented, apparently not being aware that the girls were going with men. According to her, she was lured into an upstairs bedroom under the guise of watching television.
Once in the room the defendant threw her upon the bed covering her mouth with his. He thereupon removed enough clothing to achieve a carnal connection. As he and the prosecutrix descended the stairs they encountered his mother in the kitchen. The prosecutrix made no outcry or complaint.
Later that night, under her testimony, appellant drove her, in a pickup truck with a camper cover, to Green Springs and there committed further acts of intercourse and fellatio upon her person. No objection was taken to this evidence.
When she got home about five in the morning the prosecutrix made complaint to her mother. The next day the mother took the girl to a physician. The latter testified that he saw evidence of a recently perforated hymen.
During the course of the mother’s testimony the trial judge, no less than eight times had to admonish her against volunteering answers. Thus, we find:
“Q. Okay. Do you recall — do you recall Lynn going out that night?
“A. Yes, sir. I can’t forget it.”
[R. 114]
******
“Q. Okay. Now, when Lynn came back in in the early morning hours, about what time was it?
“A. It was pretty close to 5:00.
******
“Q. Were you awake, or asleep?
“A. I was awake.
“Q. All right. Do you — what recollection do you have, if any, of that time?
“A. I remember every car that stopped.”
[R. 115]
******
“Q. All right. Immediately prior to seeing her there at 5:00 o’clock in the morning, *402 what, if anything, did you see, or hear? “A. Lynn came in, and she was real upset.”
[R. 116]
******
“Q. All right. When she came inside, did she make a complaint to you?
“THE COURT: He didn’t ask you what she said, now. He asked you did she make a complaint to you.
“A. Right away. I noticed—
******
“I am just asking you, did she make a complaint?
“Yes, or no.
“A. Yes, she sure did.”
[R. 118]
******
“Q. You have driven there and looked at a camper, haven’t you?
“A. Yes, sir. I have stood out in front of his home lots of nights.
“I sure did.”
[R. 123]
******
“Q. Did you know a young man by the name of Mike Childress at that time?
“A. My son, he took boys back and forth—
“Q. Did you, please ma’am, know Mike Childress, or not?
“A. I knew of him.
“Q. You did not know him, did you?
“A. I only stopped my son from—
“THE COURT: Let me tell you something: You are about to cause me to have to declare a mistrial in this case, and, if you do I can assure you that I will have to discipline you,—
******
“THE COURT: — and the question could be answered without your trying to spew that venom into the trial of this case.
“THE WITNESS: I’m sorry.
“THE COURT: Gentlemen, that has nothing — what that woman said — that witness said has nothing to do with the trial of this case.
“I instruct you not to consider it.
“Is there any one of you that thinks you cannot do it in passing on the issues involved in this case, that it might, in some way, poison your minds, or might bias you?
“Is there anyone that can’t?
“If there is anyone of you that can’t disregard what she said, will you please raise your hand?
“All right, thank you. No one raised his hand.
“I assume that no one — that you all feel like you can go ahead and not be biased, or prejudiced, by this remark.”
[R. 127-128]
“Q. Did you call before you went down there the first time?
“A. Yes, sir. That is the reason I went down there.
“Q. I am not asking you the reason.
“A. Yes, sir, I did.
“Q. Did you call before you went down the first time?
“A. Yes, sir.
“Q. Did you call there between the first time and the second time you went down there?
“A. Yes, sir. I wanted to see if they got a lane.
“THE COURT: You know—
“MR. REDDEN: We move to exclude that, if it please the Court.
“THE COURT: I do exclude, and instruct you — he didn’t ask you why you called.
“He said, ‘Did you call’?
“He is asking these times, and the answer is either yes, or no, or I don’t remember.
“THE WITNESS: Yes, sir.
“THE COURT: And it is not what you want to do, or why you wanted to do it.
“THE WITNESS: Yes, sir.”
[R. 135]
******
*403 “A. And, then, I went to the door, and I looked out, and, as he was going around the curve—
“He had just gotten in front of the church and I seen just the back part, and it was a camper.
“I knew that she didn’t leave in a camper, and I didn’t think at first—
“THE COURT: Don’t add all that other stuff.
“MR. REDDEN: May it please the Court—
“THE COURT: You were describing about the truck and how it went, and that was fine, but now you are blurting out, talking real fast about what you knew and didn’t know, and that sort of thing.
“That’s what I told you not to do.
“THE WITNESS: I didn’t mean it was her, because—
“THE COURT: Just don’t explain what you mean.”
[R. 137]
After the last quoted instance and with the jury withdrawn, appellant moved for a mistrial based on the cumulative effect of the witness’s manner of testifying. The trial judge had misgivings:
“I will say that if it continues it could very well create a atmosphere to where I will have to grant a mistrial, and, in the course of doing it, whether I have to grant a mistrial, or not, it is not completely based on that.
“So, if this witness does not continue to do it, I will have to tell you, Mrs. McDonald, that I do have contempt powers, and I will, if you continue to do that which I admonished you not—
“(Court Reporter’s Note:
“Thereupon, the witness drowned out the Court, with the result that further remarks of the Court and the remark of the witness was incomprehensible.)”
[R. 143-144]
II
During the cross examination of a defense witness the prosecutor, without any previous clue, asked, “Did you know at the time that Knaffl was married?”. She answered in the negative before objection was interposed.
Ordinarily a belated objection to a question fails to protect a point for appellate review and likewise a negative answer renders an objectionable question harmless. In addition, in this case, the trial judge gave a strong prompt admonition for the jury to disregard the question. The defendant’s motion for a mistrial was overruled.
III
In closing argument the assistant district attorney, at one point, said, “Her mother called the police immediately, and she then went to see Dr. May.” [R. 216]
The transcript of the testimony fails to show that the girl’s mother notified the police. Argument should be confined to the evidence and the reasonable inference therefrom.
IV
No indictment was preferred until a year had gone by. We are not advised as to why the State chose to charge Knaffl with common law rape rather than the less onerous statutory offense of carnal knowledge of a girl over twelve and under sixteen. Code 1940, T. 14, § 399. The latter carries a less severe sentence.
We are fully aware that the credibility of the girl’s testimony was for the jury. Lee v. State, 31 Ala.App. 91, 13 So.2d 583. Though going upstairs into a bedroom with a man may seem proper, even though after eleven at night, yet going with. another couple who admittedly copulated in a bedroom just across the hall from the room where Knaffl had intercourse with the pros-ecutrix, strains credulity on the issue of consent.
The prosecutrix was in the presence of at least three other persons (the other couple and Knaffl’s mother) and was in circumstances where she did not explain why she made no effort to complain or escape, except she did say that in the camper the appellant showed her a tombstone and told her unless she yielded it would be hers.
*404 Be that as it may, we are at the conclusion that this record calls for the application of the cumulative prejudice doctrine applied in Blue v. State, 246 Ala. 73, 19 So.2d 11. Particularly do we rely on the instances of “venom” set out in Part I hereof. Although the defense did not object to questions eliciting another offense (crime against nature) we mention it to convey the atmosphere of the trial.
Rape is a heinous crime and this was a particularly bad rape, if the prosecutrix’s testimony is credited beyond a reasonable doubt. The jury made such a finding, but strangely fixed punishment at the least time allowable under Code 1940, T. 14, § 395.
“The worst wretch that walks the earth is entitled to a fair trial, for the law is superior to all persons. As much as we may regret some results of the law, the law must be preserved if this constitutional democracy is to survive.” Watts v. State, 282 Ala. 245, 210 So.2d 805
“A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.” In Re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942
Sometimes it might be tempting to view a procession over the Bridge of Sighs and console oneself with the thought these unfortunates are heading for their just deserts.[1] In this case, however, we are compelled to reverse the judgment and remand this cause for a new trial.
REVERSED AND REMANDED.
HARRIS and BOOKOUT, JJ., concur in result.
TYSON and DeCARLO, JJ., dissent.

. “My uncle used to say that the jury served the great purpose of ridding the neighborhood of its sons of bitches. Men have been convicted even of murder in a jury’s exercise of this function, but the penalty does not often run so high. * * * ” Curtis, Trial Judge and Jury, 5 Vand.Law Rev. 150 at 155.