## LAKEY v. STATE.    (7 Div. 789.)

(Court of Appeals of Alabama. April 11, 1922.)

**1. Criminal law ⬤⇒918(3)—Statement of sheriff to one summoned as juror with reference to defendant's case held ground for new trial.**

In a prosecution for shooting a member of a party searching defendant's premises for liquor, it was ground for new trial for the sheriff, in urging one summoned as juror and who sat in the case to attend court, whether he received the summons or not, to say that defendant's case was coming up, and that they needed good men that would stand by the officers in carrying out the law.

**2. Homicide ⬤⇒302—Instruction that member of searching party was trespasser held abstract, where defendant did not know of the trespass when he shot another member of the party.**

On a trial for killing a member of a party searching defendant's barn for liquor, where defendant did not know until after the difficulty that one of the party had entered the house and gone into the room where defendant's wife was, an instruction that he was a trespasser in so doing was abstract, and properly refused.

**3. Criminal law ⬤⇒363—Anything said or done during search, tending to explain acts or motives at time of difficulty, held admissible as res gestæ.**

On a trial for killing a member of a party searching defendant's premises, everything said and done during the search, which might shed light on the acts of either party, as tending to explain their acts or motives, held admissible as res gestæ.

**4. Homicide ⬤⇒278—Question whether search was permitted because of intimidation held a jury question.**

Where officers went to defendant's house heavily armed after midnight, and demanded to be allowed to search his premises, if he yielded because of intimidation, the search was not permissive, but a serious trespass, and, in a prosecution for killing one of the searching party, whether this was the case was a question for the jury.

**5. Homicide ⬤⇒197 — Search warrant, which could be executed only in the daytime, not admissible to show that the search during the night was not a trespass.**

On trial for shooting member of party searching defendant's premises, where the search warrant, under Code 1907, § 7764, could only have been executed in the daytime, it was not admissible to relieve the officers of trespass or show any right to enter the premises.

---

**6. Witnesses ⬤⟿406—Search warrant held not admissible to contradict testimony that defendant asked for warrant.**

Where a search warrant would not have justified a search at night, and the sheriff was the only member of a party making a search who knew that there was a warrant, it was not admissible, on a trial for killing a member of the party, to contradict testimony that defendant asked a federal officer in the party if they had a search warrant.

**7. Criminal law ⬤⟿695(6)—Evidence inadmissible in part, and offered as a whole, properly excluded.**

Assuming that part of a statement of a witness for the state would have been admissible, where the statement was offered as a whole, and was partly illegal, there was no error in its exclusion.

**8. Criminal law ⬤⟿419, 420(6)—Statement by person, after receiving fatal wound, hearsay, unless made under belief of impending death.**

Where deceased was shot during the night, a statement by him the next afternoon was hearsay, unless made under the immediate belief of impending dissolution.

**9. Homicide ⬤⟿203(3)—Statement immediately after shooting held not sufficient predicate for dying declarations made the following day.**

Deceased's statement, immediately after being shot, that he was shot twice through the bowels and was going to die, was not a sufficient predicate for a statement by him the next afternoon, without any showing that he was then under the belief of impending dissolution.

**10. Criminal law ⬤⟿829(1)—Refusal of instruction, substantially given, not error.**

The refusal of a charge, substantially given in the oral charge, was not error.

**11. Homicide ⬤⟿289—Instruction as to finding of whisky during search in connection with which killing occurred held involved, misleading, and not relative to material issue.**

On a trial for killing a member of a party searching defendant's premises for liquor, an instruction as to the claimed finding by deceased of whisky in defendant's barn *held* properly refused, as involved and misleading, and not relating to a material issue.

**12. Criminal law ⬤⟿789(16)—Instruction authorizing acquittal, if there was any probability of innocence, notwithstanding absence of reasonable doubt, properly refused.**

An instruction that, if there was a probability of defendant's innocence from the evidence, he should be found not guilty, even though the jury had no reasonable doubt of his guilt, was properly refused.

Appeal from Circuit Court, Clay County; W. L. Longshore, Judge.

Northern Lakey, indicted on a charge of first degree murder, was convicted of murder in the second degree, and he appeals. Reversed and remanded.

While a search was being made of his premises at night, the defendant shot and killed one Ramsey, one of the searching party. The following charges were refused to the defendant:

(5) The court charges the jury that if you believe, from the evidence in this case, the search that was being made of the defendant's premises was not being made under any search warrant, either state or federal, said search would have been and was in violation of Lakey's constitutional rights, unless you believe from the evidence that Lakey voluntarily gave his consent; and if Lakey did voluntarily give his consent for the search to be made, he would have had the right to have withdrawn such consent, and if at any time during the time the search was being made the search became offensive and distasteful to Lakey, and if Lakey made that fact known to the officers making the search, it was their duty to immediately abandon the search; and if they had been searching his premises under a search warrant, it was their duty to have made known to him their official position, and the fact that they had such warrant, and to have read to Lakey, or to have permitted Lakey to have read, such search warrant, if Lakey had so desired and requested the privilege of reading the same.

(9) The court charges the jury that, if you believe the evidence in this case, Stanford was a trespasser when he went into the defendant's home, where the defendant's wife was in the room, on the south side of the house.

(11) The court charges the jury that if you have a reasonable doubt, from the evidence in this case, as to whether or not Ramsey found the bottle in Lakey's barn with the whisky in it that Hamlin says Ramsey handed to him in the barn, then you would not be authorized to find that Lakey had whisky in the barn, and if you should believe that the small bottle of whisky was found in the barn, still Lakey would not be responsible for its being there, if it was there without Lakey's knowledge.

(15) If there is a probability of Lakey's innocence from the evidence, you should find him not guilty, even though you may have no reasonable doubt of his guilt.

Riddle & Riddle, of Talladega, for appellant.

The court erred in admitting what Ramsey said about finding the whisky and handing it to the sheriff. 32 N. H. 358; Wharton on Evidence, p. 258. It was competent to show Hamlin's bias towards Lakey. 58 Ala. 215. The court erred in refusing to give charges 5, 9, 11, and 15, and in declining to grant a new trial. 17 Ala. App. 506, 86 South. 179; 206 Ala. 180, 89 South. 605.

Harwell G. Davis, Atty. Gen., for the State.

Brief of counsel did not reach the Reporter.

SAMFORD, J. [1] On a former appeal in this case (Lakey v. State, 206 Ala. 180, 89 South. 605), the Supreme Court, speaking through Sayre, J., took occasion to criticize

the action of the deputy sheriff because he went into the jury room and remained for a period of from 10 to 30 minutes without any apparent necessity therefor, although the evidence taken on application for a new trial tended to show that there was no communication between the deputy and the jury on the subject of the pending case. The intimation was, though not so decided, that this action was sufficient to have reversed the case. On this appeal it appears that the sheriff of the county, who 'himself was present at the time of the unusual search of defendant's house, out of which resulted the killing of Ramsey, one of the searching party, approached Rev. Truman G. Burgess, one of the jurors who finally was chosen to try the case, substantially as follows:

Hamlin approached Burgess and asked if he had received summons sent him. Burgess replied he had not. Hamlin then said: "I sent you two, one for the week and a special summons for Wednesday on a murder case." Upon Burgess saying he did not want to be on that kind of case, Hamlin replied: "We need good men." Burgess said: "If I do not get them, I will not have to come Monday?" Hamlin replied: "That is the reason I am telling you now. My friend Lakey's case comes up Monday." Burgess said: "Maybe I won't have to be on that," and Hamlin said: "Maybe you will; we need good men that will stand by the officers in carrying out the law, to put down this whisky business."

The sheriff of the county is its chief executive officer, and as such in a high degree must exercise great influence among the people where he serves. In the exercise of the functions of his office he comes in direct contact with the people of the whole county, clothed with great authority and having with him the majesty of the law. His duties in executing the writs and summons of the courts and the impaneling of juries places him in a position of great influence, second only to the court itself, and any action on his part towards a juror, summoned to try a case in his county, that can be construed into an intimation of a wish on his part either for or against a defendant, should be critically viewed by the courts, in determining whether or not a defendant has had that fair and impartial trial, which is the Palladium of our liberties and guaranteed under the Constitution.

In this case the defendant was on trial, charged with the murder of a member of the sheriff's official family. The sheriff was a part of the court trying the defendant. The conversation between the sheriff and Burgess would have been improper in any case, but in the case at bar was highly improper, and in the opinion of this court was calculated to prevent the defendant from receiving that fair and impartial trial to which he was entitled; the rule being, as stated in Driver v. Pate, 16 Ala. App. 418, 78 South. 412, "not whether this misconduct on his part did affect the verdict," but might it have done so?

[2] Charge 9, as requested in writing by the defendant, under the evidence in this case, asserts a correct proposition of law, but was abstract, as affecting any of the issues involved in this case. Whether Stanford was a trespasser or not, his presence in the house was not known to the defendant until after the difficulty, and therefore that fact could not have influenced the defendant, either the one way or the other, in what he did.

[3] Everything that was said and done during the search that was being made of defendant's barn and in his presence, which in any way may shed light on the acts of either party as tending to explain their acts or motives at or near the time of the fatal difficulty, is a part of the res gestæ, and admissible in evidence. 4 Michie's Dig. 138, § 214. The witness Hamlin testified that on July 2, 1920, he and two other officers went out to where defendant lived, and before going—

"got a search warrant issued by A. J. Glenn, a J. P., to search' the barn and premises of Lakey. However, we did not make any search on that trip."

It is not pretended by the sheriff that this search warrant was ever exhibited to Lakey, or that he knew of its issuance, and, indeed, as appears from the evidence, nobody seems to have known about it but the witness, and he swears that "he never executed it," and that it is lost or destroyed. Over the objection and exception of defendant, proof of the contents of this alleged search warrant was admitted in evidence. Although the solicitor stated that his purpose in offering the evidence was to contradict those witnesses who testified that Lakey asked for a search warrant, no such limitation was put upon it by the court, and by the ruling of the court it was therefore admitted generally.

In many particulars this case presents a most startling statement of facts. At 1 o'clock at night the sheriff of the county and one deputy and a federal law enforcement officer and his deputy, armed with double-barrel guns and 45-caliber Colt's pistols, went to the humble home of this defendant, about five miles in the country, where he was living with his wife, children, and widowed mother, aroused the inmates of the house from sleep, and, informing defendant that they had been informed that he had liquor in his barn, demanded that they be permitted to search. Defendant said, "All right," and got his keys and went and unlocked the barn, and standing on the outside while the search was being made, in his shirt sleeves and barefooted, but having slipped on his pants when he was first aroused and having a pistol in the pants pocket, and while this was going on one of the party

went into the house, where defendant's wife was in her night dress, and searched a part of the house. This is the testimony of the state, and the state construes this into a permissive search. The defendant says he demanded a search warrant, and was met by the statement that they were federal officers and needed none. But, whether this be a fact or not, it would, we think, make no difference in this case.

The true facts of a situation are not always presented by the words spoken. Two men may be sitting quietly side by side in friendly conversation and in friendly intercourse. The one says to the other, "Give me $100," and the other, being under no restraint, gives it to him. The transaction is legitimate. But let the same man come at the hour of midnight, awaken the other from sleep, call him to the door, where he stands in the moonlight armed with a double-barrel gun, and demand of him $100, and the other through fear or apprehension gives it to him. This would be a crime. Reeves v. State, 17 Ala. App. 684, 88 South. 197.

[4] So, if these officers had come to defendant's home at no unusual hour, and in a peaceable manner requested permission to search defendant's premises, and he had permitted it, the officers would have needed no search warrant. But, coming as they did after midnight, armed as they were, and displaying those arms to the defendant and to the members of his family, and demanding to be allowed to search the premises, a yielding of a constitutional right sacred to the citizen, under such circumstances, will not be construed into such permission as will be equivalent to legal consent. If the officers went upon the front porch of defendant's house in a peaceable manner and with lawful purpose—that is, not intending to search without a warrant, if he objected—it cannot be said that they were trespassers. But if the actions of the officers at midnight, heavily armed, were such as to intimidate the defendant, and by reason of this intimidation the defendant yielded the privacy to which he was entitled under the Constitution, such would be a trespass of the most serious nature; and this, under the facts, was a question for the jury, who would naturally want to inquire, if the mission was peaceful, why it should be undertaken by four men at midnight, when even a search warrant may not be executed in the nighttime, unless supported by an affidavit positively stating that the property sought is on the person or at the place to be searched (Code 1907, § 7764), and why, if no force was anticipated, the four should be armed with shotguns and Colt's pistols. Peaceful visits are not usually made under such circumstances.

[5, 6] The search warrant introduced in evidence over the objection of defendant could not be considered for the purpose of relieving the officers of a trespass, or to show any right to enter the home or premises of the defendant. The ancient maxim of the common law, that "every man's house is his castle," was held in high esteem by our ancestors, and is still guaranteed and preserved to us by section 5 of the Constitution of Alabama, with certain well-guarded limitations necessary to the proper enforcement of the criminal law. And while the courts of this state have not adhered to that construction put upon the maxim by Lord Camden when he said:

"To enter a man's house by virtue of a warrant in order to procure evidence against him is worse than Spanish Inquisition, a law under which no Englishman would wish to live an hour"—Code 1907, vol. 3, p. 8, note

—our statutes and decisions are uniform to the doctrine that, where the invasion of the home is necessary, it must be done in strict conformity with law; one of such requirements pertinent here being that such warrant must be executed in the daytime, unless the affidavits state positively that the property is on the person or in the place to be searched. In the instant case it appears that the warrant claimed to have been issued could only have been executed in the daytime, and therefore was immaterial. Nor was it admissible for the purpose of contradicting the defendant's witnesses, who testified that Lakey asked for a search warrant. In the first place, as has been shown, the warrant as claimed by the sheriff, even if he had it there at the time, would not have justified the search, and in the next place he seems to have been the only one who knew about the warrant having been issued, and, if a demand was made for a search warrant, it was not made of the sheriff, but of Allen, the federal officer, who says he had no search warrant and knew nothing of one having been issued.

[7] After this case had been reversed on a former appeal, and while the case was pending in the circuit court, defendant was arrested on a warrant issued by a United States commissioner, charging defendant with resisting a United States officer. He appeared before the commissioner, with two citizens who qualified as his bondsmen. The witness Hamlin on cross-examination testified that he was present at the fixing of the bond, but had not tried to prevent the commissioner from approving the bond, by telling him, or having Mr. Pruett tell him, that he (Hamlin) had an execution against one of the bondsmen (Brooks) and could not make any money out of him, and that Brooks was worth nothing on the bond. In an effort to contradict this statement, and to show the extreme bias of the witness Hamlin, the defendant offered to prove a state of facts alleged to have occurred before the commissioner at the time of taking the bond. As-

suming that a part of what was offered would have been admissible, the statement was offered as a whole, and, being partly illegal, the ruling of the court in refusing to permit the proof was without error.

[8, 9] The defendant offered to prove by the witness Eula Cox that Ramsey, the deceased, had said they (meaning himself and the other officers) did not find any liquor at defendant's house or place the night of the search, and that this statement was made in Ramsey's room on the afternoon after deceased was shot the night before; this evidence being tendered for the purpose of contradicting Hamlin, who had testified that, while the search was in progress, Ramsey, who was in the barn, said, "Here's a little," and handed Hamlin a pint beer bottle about half full of liquor. This, of course, would be hearsay, unless the statement was made under the immediate belief of impending dissolution. To establish this, defendant relies on the statement of Ramsey, immediately after the shooting, as testified to by state's witnesses, that "he was shot twice through the bowels, and that he was going to die." This was not a sufficient predicate; it not being shown that the deceased was under the belief of impending dissolution at the time he made the statement. May v. State, 55 Ala. 39.

[10] Refused charge No. 5 was substantially given by the court in his oral charge.

Refused charge 9 was abstract. The defendant knew nothing about this trespass, and such trespass, therefore, could not have affected the defendant's acts during the difficulty, and could only have tended to prejudice the jury in favor of defendant. This phase of the charge was evidently not presented by the evidence on the former appeal.

[11] Refused charge 11 does not relate to a material issue in the case, is involved and misleading, and is otherwise objectionable, not necessary here to mention.

[12] Refused charge 15 has recently been held to be bad, both by this court and the Supreme Court.

For reasons hereinbefore stated, the court committed error in overruling the defendant's motion for a new trial. Trials in this state must be fair and impartial, before a jury free from influence from any source, with the one high purpose to render a true verdict according to the evidence, as applied to the law given them in charge by a court free from bias or intimation otherwise as to what that verdict should be, and free from any intimation from any officer of the court as to what their finding should be. It is so written in justice and fair play. It is so declared in our fundamental law.

For the errors pointed out, let the judgment be reversed, and the cause be remanded.

Reversed and remanded.