48 So.2d 11

**HOULTON v. STATE.**

3 Div. 915.

Court of Appeals of Alabama.

Oct. 3, 1950.

Chas. M. Pinkston and Norman T. Spann, of Montgomery, for appellant.

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

This appellant stands convicted of murder in the second degree under an indictment charging him with murder in the first degree. The victim was appellant's young stepson, and died as a result of poisoning.

The evidence submitted by the State was, in our opinion, wholly sufficient to support the verdict and judgment rendered.

This court certified to the Supreme Court the following question in this case: "On the indictment hereinabove set out, was the jury authorized to find the defendant guilty of a lesser offense than murder in the first degree?"

The Supreme Court has answered this question in the affirmative, and thus disposed of one of the important questions involved in this appeal. See 254 Ala. 1, 48 So.2d 7.

The only other point, or points of sufficient import to warrant discussion involve the conduct of the Solicitor in his argument to the jury, and his cross examination of the appellant.

This argument has been set out in full in the record. We will extract only those parts urged by counsel as prejudicial, or which we consider material to this decision.

It is inferable from the record that Mr. Laudon Williams had testified as a witness in a previous trial of this case, but not in the present trial.

The record shows the following statements during the Solicitor's argument:

"When this case first broke, late in the afternoon, when we were in the trial of this case, Laudon Williams, of the Montgomery Apothecary, came into this court house, and called Mr. Hinson off and told him about it.

"Mr. Pinkston: We object to that and ask to exclude it from the jury.

"The Court: Yes,—that isn't evidence in the case.

"The Solicitor: What is that?

"Mr. Pinkston: You spoke about Laudon Williams, what you said.

"The Solicitor: You object about that?

"Mr. Pinkston: Yes, I do.

"Mr. Spann: We move to exclude it.

"The Court: Yes,—that isn't evidence in the case, what the Solicitor said about that witness, gentleman, coming into this court house; It is only what has been testified in this case that you consider.

"Mr. Pinkston: He has told the jury that this man came to the Solicitor and made a certain statement,—he knows that is improper.

"The Solicitor: I don't know anything of the kind.

"Mr. Pinkston: I am making my objection to the Court; he knows it is made wholly to prejudice the jury; he knows it is improper; we insist on a fair trial; after the Solicitor making such a statement, which cannot be based on any evidence in the case, we object to that and we move for a mistrial at this time.

"The Court: I overrule your motion.

"Mr. Pinkston: We except.

"The Court: I will tell the jury not to consider that testimony, it is not testimony in this trial; but I will say in deference to his remarks that Mr. Pinkston commented that Laudon Williams didn't say so and so, that was in reply to that,—if he had known anything he would have reported it to the Court.

"Mr. Pinkston: I am not guilty of that, Judge.

"The Solicitor: I don't want to prejudice this jury. God knows I don't. I have tried this case three times, and put every ounce of energy I had in this case, because I am convinced from the evidence that this man poisoned that child. Laudon Williams testified in the trial of this case, I know,—

"Mr. Pinston: We object to that. Is that proper argument? We renew our objection to the Solicitor's statement.

"The Solicitor: Didn't he testify?

"The Court: He testified (once), but it is not in evidence in this case.

"Mr. Spann: We do object to it, and we renew our motion and objection, and ask the Court to enter a mistrial, on his argument to the jury that a witness who has not and did not testify in this case made a certain statement, which was made to the jury, and he made it, apparently to prejudice the jury. It leads the jury to believe that he made such a statement; and the Solicitor knows that Laudon Williams in this case did not testify. According to the testimony of another witness in this case, he sold the poison, and he knows that is one of the weak links in the testimony, and he is trying to bolster it up by a statement made to this jury about which there is no testi-

mony given, and we respectfully submit to the Court that it is prejudicial to our client. We move for a mistrial.

"The Court: I overrule your motion.

"Mr. Pinkston: We except.

"The Court: All right.

"The Solicitor: I would give my right arm rather than to make a statement that would do him any damage before the jury. I have nothing in the world against that man, and I don't want to make any statement that would prejudice this jury. That is not my intention. I know Grover Pilgreen is still working for Mr. Williams. He has not been fired for giving his testimony in this case, and I know that the defendant swore to an untruth, according to the police record in his attempt to convey the information that Grover Pilgreen had a former police record. And I know that Charley Pinkston in his cross examination tried to construe the fact that Grover Pilgreen had drunk whiskey. What did that have to do with the case. You drink whiskey, I don't know, but I don't want even—

"Mr. Pinkston: I don't drink whiskey; it has been some time since I had a drink.

"The Solicitor: You may not drink it; it is all right; I withdraw that.

"The Solicitor: Grover Pilgreen is still working for Laudon Williams. Grover Pilgreen appeared in this court, forced by an attachment, we took him out of his home, he declined to come.

"The Court: That is evidential. (Objection and motion to exclude.)

"The Solicitor: He was brought in.

"The Court: It is in the evidence, I overrule the motion.

"The Solicitor: He was brought into this Court. He didn't want to testify against Houlton. He didn't want to testify against him. He had nothing against him, and he has got nothing against him now. All he was doing was testifying in response to the process of this court."

It is to be noted that in the above argument the extent of the reference by the Solicitor to Laudon Williams was that Mr. Williams had "called Mr. Hinson off and told him about it." No details of what Mr. Williams may have told Mr. Hinson were brought out by the Solicitor. The court sustained the defendant's objections and instructed the jury that such statement was not evidence. It is further to be noted that the court stated that the argument was in reply to argument of defense counsel. The defense counsel's argument is not set forth in the record. We cannot therefore determine whether the argument was a reply in kind or not in this state of the record, other than such light as is thrown thereon by the court's statement to that effect.

■■ Be that as it may, in view of the uncertainty of any harm that may have resulted from the Solicitor's mere statement that Mr. Williams had told Mr. Hinson about the case, with no details as to what Mr. Williams said being brought out, and further in view of the court's action in sustaining defendant's objections to the Solicitor's argument, and instructing the jury that same was not to be considered, it is our conclusion that any harm that may have been occasioned is so speculative as to prohibit a reversal of this cause because of the court's ruling denying defendant's motion for a mistrial because of this portion of the Solicitor's argument. A mistrial will not be entered on motion of the defendant where the court has sustained his objections to alleged improper argument and instructed the jury not to consider same, unless it clearly appears that the defendant's rights have been so prejudiced as to render a fair trial a matter of grave doubt. We cannot rationally say that the matters above considered create such doubt.

Appellant's able counsel further urges that this cause should be reversed because of the Solicitor's conduct during the cross examination of the appellant, and his method of such examination.

In this respect the record shows that twice during the examination defense counsel objected to the Solicitor standing near the appellant during his cross examination and shaking his finger at the defendant. In each instance the court sustained the objection and admonished the Solicitor to de-

sist in such action, which apparently was done.

■ Several general objections unsupported by any grounds, were interposed to questions propounded by the Solicitor to the appellant during this examination. In each instance the court sustained these objections. It is our opinion that none of these questions asked by the Solicitor were, in view of the court's action in sustaining the objections interposed to them, of sufficiently prejudicial tendencies to justify a reversal of this cause. Long v. State, 33 Ala.App. 463, 36 So.2d 133, certiorari denied 250 Ala. 711, 36 So.2d 136; Pate v. State, 32 Ala.App. 365, 26 So.2d 214; Cauley v. State, 33 Ala.App. 557, 36 So.2d 347, certiorari denied 251 Ala. 163, 36 So.2d 354; Head v. State, Ala.App., 44 So.2d 441;[1] Walden v. State, 34 Ala.App. 29, 36 So.2d 556, certiorari denied 251 Ala. 144, 36 So.2d 558; Corsbie v. Poore, 29 Ala.App. 487, 198 So. 268, certiorari denied 240 Ala. 207, 198 So. 272.

The trial judge gave a full and clear oral charge to the jury. In addition he gave some fourteen written instructions at the appellant's request.

Four written charges requested by the defendant were refused.

Refused charge 1, being affirmative in nature, was properly refused under the developed evidence of this case.

■ Charges 3 and 18 are identical. They were properly refused because of the use of the word supposition. Mitchell v. State, 28 Ala.App. 119, 180 So. 119, certiorari denied 235 Ala. 530, 180 So. 123.

■ Charge 14 was properly refused. See Brown v. State, 33 Ala.App. 97, 31 So. 2d 670.

The foregoing opinion was prepared prior to reading the dissenting opinion of Presiding Judge Bricken.

We disagree with Judge Bricken's views that this appellant's conviction was had mainly upon the testimony of the witness Pilgreen. Other elements are deducible from the evidence which in our opinion raise strong inferences of appellant's guilt. We now feel we should set out some of the evidence tending to establish these elements.

The deceased child was sick for several days prior to his death, suffering from vomiting and upset stomach, which symptoms were shown by testimony to accompany arsenic poisoning.

The mother of the child worked in a cafe during this period. The appellant was working part time as a fireman on a railroad, but for most of the period shortly prior to the child's death was at home.

There was evidence tending to show that upon the first illness of the deceased the appellant reported such fact to the mother at her place of employment, but stated that the child appeared to be much better. These same symptoms continued to occur for three or four days. The child's mother testified that some two days prior to its death the appellant told her he had had Dr. Alice Pye visit the child at home, and that Dr. Pye had stated that the child had only a slight colitis, and to give it a few drops of paregoric.

The mother of the child also testified that one night during the child's illness he had asked for water, and had stated he did not want any sweetened water; "and I says, 'Well, darling, you haven't had any sweetened water,' and he says 'Yes, Daddie Bill (appellant) gave me sweet water.' He said it was sweet and wasn't good." This occurred in the presence of the appellant.

Other evidence of the State tended to show that arsenic has a sweetish taste.

Dr. Pye testified that on the morning of Wednesday 22 October, the appellant came to her office and said that the child was sick, and had been sick since the previous Sunday, and after detailing the child's symptoms asked for a prescription. Dr. Pye, whose office was less than two blocks from the appellant's home told appellant it was not her habit to treat children without seeing them, and that she would see the child in her office if appellant would bring him in. The appellant never brought the

[1]. Ante, p. 71.

child to Dr. Pye, nor was Dr. Pye called to appellant's home. The night following, at about 12 o'clock, Dr. Pye was called to the hospital to see the child. She found him "in a deep coma, just as though he was sleeping, and in a very few minutes, say ten or fifteen minutes, he expired. And I examined him as best I could at the time. I saw no cause for the type of coma, near death, and in about an hour, he just slept away."

Mr. W. G. Farmer, an insurance agent, testified that a few weeks before the death of the child the appellant had taken out a life insurance policy on it, in the amount of $500.00, making himself beneficiary. The appellant had requested Mr. Farmer not to mention anything to the child's mother about the taking out of this insurance.

The mother of the child testified that she did not know of the insurance transaction.

The evidence further shows that the appellant was in financial straits at about this period of time, and was involved with 7 or 8 loan companies.

After the child's death there was apparently quite a family argument as to the place of burial, the appellant insisting that the body not be carried to Georgia for burial, as the mother and her people wished. The child's body was however interred in Georgia.

After the child had been interred, but before exhumation of the body, the appellant went to the office of Dr. Pye and entered into a conversation with Mrs. Laura Penton, a nurse in said office. In the course of this conversation the appellant stated that "they suspected him of giving poison," and asked Mrs. Penton what the effects *of arsenic* would be.

Examination of the organs of the child made by the State Toxicologist of Georgia show that they contained arsenic in quantities many times larger than would be necessary to have caused death. From his examination and tests Dr. Jones, the toxicologist, was of the opinion that the arsenic had been administered to the child over a period of time.

35 Ala.App.—29

In his testimony the appellant denied that any of the above outlined facts had occurred. This contradiction of course raised but a question of fact solely within the province of the jury to resolve.

The court in its oral charge instructed the jury fully as to the burden of proof cast upon the State; as to the defendant's presumption of innocence; as to their duty to the defendant; and as to the burden of proof in circumstantial evidence cases; and that this was a circumstantial evidence case.

Both the Solicitor and the counsel for the appellant announced they were satisfied with the oral charge of the court.

The court also, at the request of the appellant gave some fourteen written instructions to the jury. Practically all of these written instructions outline the circumstances under which the defendant could not be convicted, or should be found not guilty.

■ This aside, it affirmatively appears that appellant's counsel announced they were satisfied with the court's oral charge. In the absence of an exception to the court's oral charge we are of the opinion that nothing is presented to us for review in this regard. Indeed, in the fairly recent case of Easley v. State, 246 Ala. 359, 20 So. 2d 519, the Supreme Court held that even in appeals perfected under our automatic appeal statute, that such statute is not broad enough to require review of an oral charge in the absence of exceptions thereto.

We are not impressed that the conduct of the Solicitor in the present case was of such prejudicial tendency as to make applicable the doctrine enunciated in the Blue case, [Blue v. State, 246 Ala. 73, 19 So.2d 11], cited and relied on in the dissenting opinion. Certainly the questions propounded in the Blue case were unquestionably of a type which were likely, if not necessarily, to arouse the emotions of a jury to the prejudice of the defendant. We do not find that degree of impropriety in the present case.

It is our opinion that this record is free of error probably injurious to the substan-

tial rights of this appellant and is therefore due to be affirmed. It is so ordered.

Affirmed.

BRICKEN, Presiding Judge (dissenting).

After a thorough study and careful consideration of the entire record in this case, I am unable to concur in the foregoing opinion of my associates.

It is my profound judgment and conclusion that the judgment of conviction in this case is wrong and unjust, under the facts and conditions disclosed by the record. The unusual and unprecedented manner in which the trial below was had, leads me to the conclusion that there exists a very grave and substantial doubt as to the guilt of the defendant, and because of which, error prevailed in the action of the trial court in overruling and denying defendant's motion for a new trial.

The unusual history of this case, in many respects, tends to sustain the insistence that a grave and substantial doubt exists as to the guilt of the accused. The record shows that the case has been tried three times. The first two trials failed to find him guilty; and the third trial is replete with many instances and facts which shows that the defendant was not accorded the fair and impartial trial to which he was under the law entitled.

A large number of citizens, men and women, from various walks of life testified to the good character of the defendant. Said testimony was without dispute or conflict. The Solicitor, contrary to lawful procedure, severely criticized the thirty or forty witnesses who testified as to the good character of the defendant, and deprecated their testimony by stating to the jury in his closing argument: "Just don't say that Houlton put in a fine lot of witnesses here. * * * Some of them didn't know probably what he was doing. I don't say they are lying because I don't know, but I don't usually pay much attention to that class of testimony. I am telling you these things, gentlemen of the jury, because I want to show to this jury how ridiculous it is to try a man on his character evidence. * * *

I want to emphasize the ridiculousness of letting people walk out of this courthouse because of men and people coming in and swearing that the man had a good character. * * * I further tell you that if this defendant had a good character I was a horse thief, and I never owned a horse in my life. I don't care what his witnesses say." There were other statements of like import made by the Solicitor, who should have known that the law is, that good character of the defendant, when proven, must be taken in connection with all the other evidence in the case and may raise a reasonable doubt of the defendant's guilt which would entitle him to an acquittal, when without such testimony of good character no such doubt would have arisen.

There appears in the record many other statements and prejudicial actions of the Solicitor pending the trial. In his "opening statement" to the jury the Solicitor stated: "I am a horse thief if this man is not guilty, and I never owned a horse in my life." Upon the examination of the first witness for the State, he propounded this question. "Q. Then, when Kerry Wayne Ingram (the deceased) *was poisoned* where did you live." The court, in a cursory manner, sustained defendant's objection to said question. The injury was done however and the unauthorized question tended to prejudice the jury against the defendant. It was a question for the jury as to whether or not the deceased has been poisoned, and not for the Solicitor to so declare.

On cross examination of defendant the Solicitor stated to the defendant: "Don't you know you are telling a lie to this jury." The court sustained defendant's objection and stated: "You don't ask the witness if he is telling a lie." Solicitor asked defendant on cross examination: "Q. Well, you testified just now you went around to meet your wife every night when she got off. A. Yes sir." Then the Solicitor stated: "Well, if you were working so hard, *how in the hell* could you meet her every night?" And further he stated, "If you made so much money from the railroad, three hundred or three hundred and fifty dollars a month, why in the hell did you

borrow so much money?" Further he said: *"Well how in the hell,* did somebody slip in there and give that baby arsenic?"

The 12th and 13th grounds of defendant's motion for a new trial appear to be borne out by the record. Said grounds are as follows:

"12. The improper conduct of the Circuit Solicitor, in stating to the jury, during the course of his argument that there has been two previous mistrials in the case, that he had been obliged to expend sums of money from his personal funds to procure witnesses for the State, and that for that reason he insisted that the jury bring in a verdict so that another mistrial would be avoided.

"13. The improper conduct of the Circuit Solicitor, during the progress of the trial in standing within two or three feet of the defendant while this defendant was a witness on the stand, shaking his finger in the witness' face and calling him a liar, and persisting in such conduct after the Court had ruled it improper."

The law, and rules of practice, provide that: "It is the duty of the prosecuting attorney to be fair and impartial in presenting the evidence for the prosecution and in examining or cross-examining witnesses". 23 Corpus Juris Secundum, Criminal Law, § 1087, page 533. And further: "He should examine witnesses with dignity, decorum, and due consideration, and should not take advantage of his position to abuse, insult, or ridicule them, or to intimidate them". 23 C.J.S., Criminal Law, § 1087, page 535.

"The office of solicitor is of the highest importance; he is the representative of the state, and as a result of the important functions devolving upon him as such officer necessarily holds and wields great power and influence, and as a consequence erroneous insistences and prejudicial conduct upon his part tend to unduly prejudice and bias the jury against the defendant; this, without reference to the instructions of the court. The test in matters of this kind is not necessarily that the conduct of the solicitor complained of did have such effect upon the jury, but might it have done

so?" Jones v. State, 23 Ala.App. 493, 127 So. 681, 682.

As being directly applicable to the case at bar I hereby quote from the recent opinion of our Supreme Court in the important case of Blue v. State, 246 Ala. 73, 19 So.2d 11, 16:

" 'a trial is a legal battle, a combat in a sense, and not a parlor social affair.' The record shows that the presiding judge exercised great patience and in most of these incidents did what he could to disabuse as far as possible the minds of the jury of any prejudicial impression; but it is our duty to see to it that trials are free from prejudice and passion and that the courthouse means that where a conviction is obtained, it is obtained in an impartial atmosphere. The foregoing remarks were made in the presence of the jury. Considering them in their cumulative effect, we think that they were calculated to inject the poison of bias and prejudice into the minds of the jury. They created an atmosphere of bias and prejudice which no remarks by the court could eradicate. This is not justice and prejudicial error has been shown. * * *

" 'Reverting to the various arguments and statements which the appellant assigns as showing a general course of prejudicial appeal to the jury, and as creating a general atmosphere of illegal presentation of facts, etc., it is not necessary to consider whether any one or more of these occurrences, if standing alone, would require a reversal. We content ourselves with stating that, as to several of these a serious question would be presented on the single occurrence, even if it were not accompanied by many other such occurrences throughout the trial. While, in most of the instances, the court sustained the defendant's objections and granted his motions to exclude, these occurrences were so numerous, and in many instances evidenced such persistence of effort to present to the jury facts held illegal by the court, that they could not have failed to prejudice the defendant.'

* * * * * *

" ' "A defendant is entitled to a fair trial by jury according to the law and the evidence, and such trial should be free from

any appeal to prejudice or other improper motive. It would appear that the learned and upright judge before whom this trial was conducted did all in his power to right the wrong occasioned by the improper and untimely remarks of the solicitor; it cannot, however, be seriously doubted but that the poison that had been injected would be difficult to eradicate; * * * and therefore the court was in error in overruling defendant's motion for a new trial." ' "

"The trial of this man was of grave and serious import to him, and of importance to the state. That the conduct complained of was highly improper, reprehensible, in fact, and should not have been indulged in cannot be doubted or questioned. The rule of law governing matters of this character and by which this court must be governed is not only that the misconduct complained of did affect the verdict, but might it have done so. In Driver v. Pate, 16 Ala.App. 418, 78 So. 412, 413, this court said:

" ' * * * the question is not whether this misconduct on his part did affect the verdict, for it has been held many times that it need not be shown, necessarily, that the misconduct relied on as a ground for a new trial actually controlled or determined the verdict, if it is made apparent that the verdict might have been affected by it.' Weaver v. State, 17 Ala.App. 506, 86 So. 179; Lakey v. State, 18 Ala.App. 442, 93 So. 51; Taylor v. State, 18 Ala.App. 466, 93 So. 78; Holladay v. State, 20 Ala.App. 76, 101 So. 86."

The State introduced a witness, a man by the name of Pilgreen, by whom the State attempted to prove that the defendant purchased poison in a drug store where he was employed as a clerk. The testimony of said witness was contradictory and uncertain, and in no sense was his testimony convincing or impressive. He testified he was not a druggist and that some time, about two years ago, the defendant came into the drug store. He was asked:

"Q. Tell the jury, if you recollect it, what he purchased from that drug store? A. Well, he didn't purchase it from me, personally. It was sodium arsenic. Laudon Williams sold it to him, and I got the money.

"Q. He paid the money? A. Yes sir.

"Q. How much did he purchase? A. *He gave me a quarter*.

"Q. Do you remember anything that occurred in that transaction, at that time? A. Yes sir I do; I told him I couldn't sell it to him; and Laudon Williams got mad—he sold it to him, *and* (Williams) *slung me the money*.

On cross examination the record shows the following:

"Mr. Pinkston: Laudon Williams got mad at you? A. Yes.

"Q. Because you didn't sell it to him? A. Yes.

"Q. You all have a poison register at the store? A. Yes, sir.

"Q. Did you all have one at that time? A. Yes.

"Q. Did you register the man's name? A. No, sir.

"Q. You told Laudon Williams you sold it to him, and didn't make a record of it? A. Yes, sir.

"Q. You read in the paper about the child's death? A. Yes, sir.

"Q. Didn't you? A. Yes, sir.

"Q. Is that when you called it to the attention of Mr. Seibels? A. I didn't call his attention to it,—they sent down and got me.

"Q. Didn't you call it to the attention of Mr. Seibels, Mr. Pilgreen? A. No, sir; I didn't.

"Q. You never called it to anybody's attention? A. No, sir.

"Q. Nobody? A. No, sir.

"Q. Not a soul's attention? A. No, sir.

"Mr. Pinkston: Are you a frequent drinker? A. No, sir.

"Q. Have you ever been in jail for drinking? A. No, sir.

"Q. Mr. Houlton never put you in jail for drinking? A. No, sir.

"Q. Are you very familiar with poison? A. Yes, sir.

"Q. Have you ever bought any poison, yourself? A. No, sir.

"Q. Have you ever been to the hospital for taking poison? A. I went to the hospital. I thought I had poison, but I didn't.

"Q. Did Dr. Bickerstaff,—was he the doctor? A. That's right, sir.

"Q. You went there because you had taken poison? A. No. I thought it was poison.

"Q. You are kind of hypped on poison? A. Yes, sir.

"Q. On the subject of poisoning? A. Yes.

"Q. You have taken some? A. Well, I haven't—

"Q. Was it arsenic? A. I thought it was,—I was merely trying to mix a poison, and I thought I drank it.

"Q. How many times did you go to the hospital for poison? A. I went out there one time for it, but it wasn't poison.

"Q. You say it wasn't? What did Dr. Bickerstaff say? A. He said it wasn't.

"Q. You tell this jury that Laudon Williams sold this poison and didn't report it? A. No. He didn't report it,—no."

From the foregoing it clearly appears that the witness was not a normal person, but clearly a crack-pot who freely admitted he was "hipped" on the question of poison. His testimony clearly established this fact. Furthermore the testimony of the erratic witness Pilgreen was wholly without corroboration of any sort, and upon his testimony mainly the conviction of this defendant was had. The defendant testified, emphatically, that he had never bought any poison from said witness, or any one else, at any time. This portion of defendant's testimony was strongly corroborated by the undisputed fact that the log or record of poison sales, kept in the Williams drug store, as required by law to be kept shows no record of a sale of poison to appellant.

The section of the Code of Alabama 1940, Title 14, Section 314 provides, "Every homicide, perpetrated by poison * * is murder in the first degree." A reasonable construction of said section means that homicide by poison is a wilful, deliberate, malicious and premeditated killing as a matter of law. The crime is so heinous that the legislature made it plain that one resorting to poison as a means of taking the life of another could expect to suffer death, or life imprisonment.

Our Supreme Court, however, has recently held that a person convicted of murder by poison may also be convicted of murder in the second degree, or manslaughter in the first degree. By virtue of the statute the opinion of the Supreme Court is binding upon this court.

The evidence in this case without dispute shows that this defendant loved his little step-son dearly, and that the child, in turn, loved the defendant likewise. If this defendant deliberately murdered the little child by administering poison to him, as contended by the State, the crime was indeed a horrible one, without any semblance of justification or mitigation, and nothing less than the death penalty for the atrocious act should have been inflicted. The fact that no such verdict was rendered, manifestly and conclusively indicates that the jury who tried the case entertained a strong and substantial doubt as to his guilt, and as a result rendered a compromise verdict by finding the defendant guilty of murder in the second degree only, and inflicted a punishment wholly out of line with the enormity of the horrible crime with which he was charged.

A compromise verdict is like unto a quotient verdict, and the law does not contemplate or favor such a verdict as being contra to a fair and true verdict. A verdict is a true verdict, where it is voluntary conclusion of the jury after a deliberate consideration, though the respective jurors may have been liberal in concessions conscientiously and freely made, but it is not a true verdict if it is the result of any rule or order, whether imposed by themselves, or by the court, or officer in charge. Ledbetter v. State, 17 Ala.App. 417, 85 So. 581. "Conviction of manslaughter in first degree held required to be reversed where evidence showed conviction was result of compromise". Roberts v. State, 26 Ala.App. 331, 159 So. 373.

Numerous other incidents occurred during the trial of this case, which in my opinion were highly prejudicial to the substantial and legal rights of the accused. This the record discloses.

The remaining proposition, as appears in the record proper, in my opinion must be conclusive of this appeal. In his closing instructions of the trial judge, he charged the jury as follows:

"Now, after giving the defendant the benefit of every reasonable doubt, and you believe he is guilty of murder in the first degree, then it is your duty, and you have the responsibility as a matter of fact, if you believe beyond all reasonable doubt, he is guilty of these unlawful degrees of homicide, to a moral certainty, you would find the defendant guilty of murder in the first degree, and it is your responsibility of fixing the punishment.

"I have prepared forms to guide you in writing your verdict, which you will have with you in the jury room. The punishment for murder in the first degree is either life imprisonment in the penitentiary or death, which in this State now is the electric chair.

"The punishment for murder in the second degree is any number of years from ten on up.

"The punishment for manslaughter in the first degree is any number of years in the penitentiary from one to ten years.

"So you have several forms of verdict which I have fixed out for you. You can carry these forms in the jury room with you. The first one, in case you find him guilty of murder in the first degree beyond all reasonable doubt, the form of your verdict would be: 'We, the Jury, find the defendant guilty of murder in the first degree, and fix as his punishment that he suffer death.' Or, 'We, the Jury, find the defendant guilty of murder in the first degree, and fix his punishment at life imprisonment in the penitentiary.' If you so find him guilty of murder in the second degree, the form of your verdict would be: 'We, the jury, find the defendant guilty of murder in the second degree and fix his punishment at (blank) term of years in the penitentiary,'

anywhere from ten on up. If you find him guilty of manslaughter in the first degree, the form of your verdict would be: 'We, the jury, find the defendant guilty of manslaughter in the first degree, and fix his punishment at (blank) years in the penitentiary,' anywhere from one year up to ten years.

"*Those are the only possible verdicts the jury can return,* and I have the forms prepared for you here. You carry these forms into the jury room with you. The first thing you do in the jury room, you select your foreman, and when you have arrived at a verdict, write it on the back of this indictment, and let the foreman sign it. You will retire and make up your verdict. It should be a fair, a just and an impartial verdict. It must be a unanimous verdict."

The foregoing mandatory charge was an oral charge of the court to the jury, *that the jury must return a verdict of guilty* as to one of the degrees of homicide included in the charge in the indictment, and none other. No verdict form of acquittal was furnished the jury, as will be noted. The Statute provides that "The court * * * shall not charge upon the effect of the testimony, unless required to do so by one of the parties." Code 1940, Tit. 7, § 270. From the conflicting evidence in this case a directed verdict could not be given. The fact that the court may have charged the jury correctly in other portions of his oral charge, could not cure the erroneous charge which concluded the closing instructions to the jury, to the effect that they must find the defendant guilty and could return no other verdict; for the law is that an erroneous charge cannot be cured by giving a correct one. Cadle v. State, 27 Ala.App. 519, 175 So. 327, and cases cited.

Defendants in criminal cases are not required to assign errors, to argue the case, or to file briefs on appeal. The law makes the appellate court, as it were, their guardian, and requires the court to search the record for errors, and, if any are found, to reverse, unless it affirmatively appears that no injury to the defendant resulted from the error.

"Human liberty is too sacred and has been too dearly bought to authorize a con-

viction, except upon legal evidence connecting the defendant with the commission of a crime, and that beyond a reasonable doubt. Facts which would warrant a suspicion, however strong, do not overcome the presumption of innocence." Tuggle v. State, 22 Ala.App. 89, 112 So. 540.

From the foregoing, I am firmly of the opinion that a reversal of this case should be ordered, and the cause remanded to the lower court in order that the appellant may be accorded a fair and impartial trial, free from injurious error, such as the law contemplates and provides.